UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| MARICRUZ HERRERA LOPEZ, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:18-cv-170-HSM-HBG |
| | ) | |
| TAMMY WALKER d/b/a AMERICAN MADE | ) | |
| APPAREL, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the referral Order [Doc. 95] of the District Judge.

Now before the Court is Plaintiffs' Motion for Default Judgment [Doc. 9]. The Court addressed the Motion on December 4, 2018, January 22, 2019, and January 23, 2019. Accordingly, for the reasons more fully explained below, the Court **RECOMMENDS** Plaintiffs' Motion [**Doc. 9**] be **GRANTED IN PART AND DENIED IN PART** and that Plaintiffs be awarded $53,454.02 in damages, in addition to attorney's fees and expenses.

## I.     BACKGROUND

The Court will begin with the allegations in the Complaint and then turn to the procedural history of this case.

### A.     Allegations in the Complaint

The Complaint [Doc. 1] in this matter was filed on May 3, 2018, by seven Plaintiffs: Maricruz Herrera Lopez, Jose Luis Abad Alfonso, Liliana Rivera Jacuinde, Amalia Giron Cinto, Paula Galindo San Pedro, Marta Eusebio Hernandez, and Maria Morales Yanez. Plaintiffs are former employees of Defendant, who owns and operates a plant known as American Made Apparel in Jacksboro, Tennessee. [Doc. 1 at ¶¶ 7-13, 15-16]. The Complaint states that Plaintiffs are

undocumented residents residing in this judicial district and that Defendant is aware of Plaintiffs' immigration status.  [*Id.* at ¶ 17].

The Complaint avers that the working conditions at Defendant's plant were horrendous.  [*Id.* at ¶ 18].  The Complaint states that workers were often without access to running water and basic sanitary items like toilet paper.  [*Id.*].  The Complaint alleges that despite extreme temperatures in the factory during the summer and winter months, there was no heat or air conditioner at the factory.  [*Id.*].  The Complaint alleges that the garbage often piled up, resulting in an extreme cockroach and rodent problem and that workers were not permitted to use the bathroom.  [*Id.*].  The Complaint states that the workers were told that they would need to buy diapers if they needed to go the bathroom during their breaks.  [*Id.*].  The Complaint further alleges that Defendant told the employees that they were required to clean the bathrooms because she did not want to pay someone else to clean them, and Defendant threatened to close the bathrooms if the employees did not clean them.  [*Id.*].  The Complaint avers that because there was often no running water to clean the bathrooms, Plaintiffs collected rain water to clean the bathrooms.  [*Id.*].

Further, the Complaint states that Defendant withheld at least twelve percent of the employees' paychecks for taxes, but Defendant did not pay these withheld sums to the Internal Revenue Service ("IRS") and kept the money for herself.  [*Id.* at ¶ 19].  The Complaint states that in recent months, Defendant failed to pay her employees for worked performed.  [*Id.* at ¶ 20].  The Complaint alleges that in order to keep Plaintiffs from leaving their positions, Defendant threatened them with serious harm or physical restraint and also with abuse or threatened abuse of law or legal process.  [*Id.* at ¶ 21].

The Complaint states that Defendant told Plaintiffs at various times that if they quit their jobs and found a new employer, Defendant would call Immigrations Customs and Enforcement ("ICE") on Plaintiffs' new employer.  [*Id.* at ¶ 22].  As a result, Plaintiffs continued to work longer

2

than they otherwise would have despite not being paid. [*Id.*]. Further, the Complaint states that at various times, Defendant told Plaintiffs, except Plaintiff Jose Alfonso, that she would pay them all wages owed on Friday if they came into work but that if they elected to quit, she would not pay them anything, despite owing them thousands of dollars in unpaid wages. [*Id.* at ¶ 23].

The Complaint states that Defendant threatened Plaintiffs Paula San Pedro and Marta Hernandez that if they quit their jobs, Defendant would use the money owed to them to hire new workers. [*Id.* at ¶ 24]. Further, the Complaint alleges that Defendant told Plaintiff Alfonso that if he came to work on Friday, she would pay him, but if he did not come into work, she would not pay him until twenty-one (21) days elapsed. [*Id.* at ¶ 25]. The Complaint states that Defendant also threatened to call immigration on Plaintiff Alfonso. [*Id.*].

Further, the Complaint states that Defendant deducted money for insurance through the Colonial Life Accident & Insurance Company from the paychecks of Plaintiffs Liliana Jacuinde, Paula San Pedro, and Marta Hernandez. [*Id.* at ¶ 26]. The Complaint alleges that while Defendant deducted such money, she failed to purchase the insurance on behalf of the employees or she allowed the insurance to lapse. [*Id.*]. The Complaint states that Defendant continued deducting the insurance from these three Plaintiffs' checks for a lengthy period of time despite the fact that the insurance was not in effect. [*Id.*].

The Complaint continues that Plaintiff Cinto's paycheck, dated November 17, 2017, in the amount of $360 was returned as having insufficient funds, and Defendant failed to make restitution to Plaintiff Cinto for this check. [*Id.* at ¶ 27]. Further, the Complaint states that Defendant induced Plaintiff Paula San Pedro to return to work by falsely promising that she (Defendant) would pay Plaintiff all monies that were due. [*Id.* at ¶ 28]. The Complaint alleges that this false promise was made just a couple of days prior to a raid conducted by ICE at the American Made Apparel Factory on February 14, 2018. [*Id.*]. The Complaint states that Plaintiffs Paula San Pedro, Maricruz Lopez,

3

and Maria Yanez were each detained as a result of the ICE raid, but they were released on bond pending further deportation proceedings. [*Id.*]. The Complaint states that upon information and belief, Defendant called ICE on Plaintiffs and others in order to avoid having to pay these workers for the long overdue wages that she owed them. [*Id.*].

The Complaint states that Defendant often required Plaintiffs to sign a document purporting to show that they were paid their full wages prior to obtaining the envelope containing their wages. [*Id.* at ¶ 29]. When Plaintiffs opened the envelopes, however, they discovered that they had been paid significantly less than their full wages. [*Id.*]. The Complaint alleges that Plaintiffs regularly worked in excess of forty hours per week without being paid by Defendant. [*Id.* at ¶ 30]. The Complaint also provides the amount that each Plaintiff is allegedly owed for unpaid wages. [*Id.* at ¶¶ 31-37].

The Complaint alleges nine counts as follows: (1) violations of the Victims Trafficking Protection Act ("VTPA") for forced labor, 18 U.S.C. § 1589; (2) violations of the VTPA for trafficking with respect to forced labor, 18 U.S.C. § 1590; (3) violations of the Fair Labor Standards Act ("FLSA") (minimum wage claim), 29 U.S.C. § 206(a); (4) violations of the FLSA (overtime claim), 29 U.S.C. § 207; (5) violations of the FLSA (anti-retaliation provision), 29 U.S.C. § 215(a)(3); (6) breach of contract; (7) quantum meruit/unjust enrichment claim; (8) common law fraud, fraudulent misrepresentation, and fraudulent inducement; and (9) conversion.

### B.    Procedural History

Defendant was served with process in May 2018. [Doc. 6]. Defendant did not respond to the lawsuit, and therefore, Plaintiffs moved for entry of default. The Clerk entered a default on July 6, 2018. [Doc. 8]. On the same day, Plaintiffs filed the instant Motion. [Doc. 9]. Specifically, Plaintiffs' Motion requests default judgment with respect to Defendant's violations of the FLSA for unpaid wages, including overtime compensation, and for Defendant's violations of the VTPA.

4

The Motion requests that Plaintiffs be awarded their unpaid wages and liquidated damages pursuant to the FLSA. In addition, the Motion requests that each Plaintiff be awarded $10,000 in compensatory damages for pain, suffering, and mental anguish under the TVPA. Finally, the Motion requests attorney's fees and costs. In support of the Motion, Plaintiffs filed an Affidavits, detailing the amount they are owed and the conditions of their employment with Defendant.

Subsequently, on September 13, 2018, the undersigned issued a show cause Order [Doc. 15], directing Defendant to appear before the Court on October 18, 2018, to show cause why a default judgment should not be entered against her. On October 17, 2018, Defendant contacted the Court and requested a continuance of the show cause hearing. The Court canceled the show cause hearing and reset the hearing for December 4, 2018, the date agreed upon by the parties.

On December 4, 2018, Attorney Ben Houston appeared on behalf of Plaintiffs, and Defendant appeared pro se. During the hearing, Defendant stated that she did not understand the process and that she was trying to retain counsel. She acknowledged, however, that she was aware that a default had been entered against her. She argued that ICE retained all of her files. Plaintiffs requested that the Court enter a default judgment, asserting that Defendant has had ample time to respond to this lawsuit. At the hearing, the Court stated that the request for a default judgment is well taken and that Defendant's reasons for not responding to the lawsuit are insufficient. Defendant requested additional time to present evidence on damages. Despite Plaintiffs' objection to another continuance, the Court granted Defendant's request and reset the hearing to January 22, 2019.

On January 22 and 23, 2019, the parties presented before the Court for a hearing related to Plaintiffs' damages request. Attorney Ben Houston appeared on behalf of Plaintiffs. Defendant proceeded pro se. The Court will summarize the testimony below.

5

## II.    SUMMARY OF THE TESTIMONY

During the January 22 and 23 hearing, each Plaintiff testified to his/her unpaid wages and the working conditions of the factory.  In addition, Plaintiffs called Christie Hill and Angela Muse as witnesses.  Defendant testified on behalf of herself.  Accordingly, the Court heard the following testimony.

### A.    Plaintiff Jose Alfonso

On direct examination, Plaintiff Alfonso testified that he worked for Defendant beginning on September 24, 2007, and ending December 7, 2017.  He testified that Defendant owes him $1,626.88 in unpaid wages.

Plaintiff Alfonso stated that the working conditions at the factory were bad.  For instance, he stated that there was no heat inside the building when it was cold and that there was garbage in the corners.  He stated that the garbage attracted cockroaches and mice.  Further, Plaintiff Alfonso testified that there was no toilet paper and that sometimes there was no running water.

Plaintiff Alfonso continued that Defendant made threats to him regarding ICE.  Specifically, he testified that on one occasion when he tried to quit, Defendant threatened to call ICE.  Plaintiff Alfonso testified that he continued working for Defendant because of her threats.  Further, he testified that Defendant told him that if he returned to work on Monday, she would pay him his wages.  Plaintiff Alfonso stated that because he decided to quit, Defendant refused to pay him his back wages and told him to return in twenty-one (21) days.  Plaintiff Alfonso testified that when he returned twenty-one (21) days later, Defendant told him that she was going to call ICE on Plaintiff Alfonso's new employer.  He testified that he suffered mental anguish due to Defendant's actions.

On cross examination, Plaintiff Alfonso testified that he could not remember the weeks that he was unpaid but that "everything is on the papers."  He denied that Defendant only owes

6

him $454.61 for unpaid wages. He stated that he does not remember the exact date that he came in to receive his pay but that it was twenty-one (21) days after Defendant told him to come back. He stated that Defendant did not give him any money when he returned on the twenty-first day. Plaintiff Alfonso testified that Defendant told him, as she was laughing and smiling, "Enjoy your job while you can because I am going to call ICE."

Further, on cross examination, Plaintiff Alfonso testified that sometimes, Defendant would hand out checks, but the checks were not complete. He stated that he spoke to Defendant before he quit because he was angry that taxes were being withheld from his check. Plaintiff Alfonso testified that taxes were withheld from several paychecks. He later testified that he never became angry with Defendant for withdrawing taxes. He continued that he never received a document showing how much money was withdrawn from his wages.

### B.     Plaintiff Liliana Rivera Jacuinde

On direct examination, Plaintiff Jacuinde testified that she started working for Defendant on April 24, 2017. She testified that Defendant owes her $2,981.25 in unpaid wages. She testified that she was not paid for the last five weeks that she worked. She explained that she received an envelope with a check inside and that when she went to cash the check, she could not receive the payment.

With respect to the working conditions, Plaintiff Jacuinde testified that there was no water in the bathrooms and that when she called the managers to use the restroom, the managers required her to wait until her lunch break. She testified that there was garbage piled up and that there was no heat in the building.

Plaintiff Jacuinde stated that Defendant did not make threats to her about ICE, but when Defendant was angry, she said that she would "kick our butts and get us out of there." Defendant threatened Plaintiff Jacuinde that if she did not report to work, Defendant would not pay any back

wages that were owed. Plaintiff Jacuinde stated that sometimes, Defendant did not have money to pay her and that she would have to wait an additional week to get paid. She testified that she did not experience mental anguish as a result of Defendant's actions.

On cross examination, Plaintiff Jacuinde testified that she does not recall the first time that she worked for Defendant. She stated that she worked for Defendant when the factory opened, but during that time, she was paid. She denied that Defendant only owes her $91.00 in unpaid wages. She testified that sometimes she missed work in order to take her son to the doctor. Plaintiff Jacuinde testified that Defendant gave her checks without having sufficient funds in the bank. She stated that the check that was returned for insufficient funds was about $600 and that Defendant never paid her those funds. She testified that the only time she signed for her check was when she believed the check was sufficient.

### C.      Plaintiff Amalia Cinto

On direct examination, Plaintiff Cinto testified that she was employed by Defendant and that she stopped working for Defendant on January 27, 2018. She testified that Defendant owes her $1,755 in unpaid wages. She testified that the checks she received were not in the full amounts owed. In addition, Plaintiff Cinto testified that Defendant stated that if she (Plaintiff Cinto) quit, Defendant would not pay her any back wages. She stated that Defendant made threats week after week and told the employees that another employer would not employ them without papers. Defendant threatened to call ICE if Plaintiff Cinto found another job. Plaintiff Cinto testified that she continued working for Defendant because she wanted to get paid but that it was costing her money to travel to and from work.

With respect to the working conditions, Plaintiff Cinto testified that the factory was in bad condition. She testified that sometimes there was no running water and that sometimes she was not allowed to use the restroom until lunchtime. She stated that she suffered mental anguish.

8

On cross examination, Plaintiff Cinto stated that she does not know the exact date she began working, but she began working in 2010. Plaintiff Cinto testified that when she began working for Defendant, she was paid $8.00 per hour. Later, she was paid $9.00 per hour, and then, she began getting paid for production. At one time, she was paid $18.00 per hour. Plaintiff Cinto testified that during that time, Defendant paid wages, but that was seven years ago. Plaintiff Cinto denied that Defendant only owes her $727.31 in unpaid wages. She stated that she was required to sign a document before she received her check. She testified, however, that there were insufficient funds to cash her checks. She stated that no one forced her to sign the document in exchange for her check, but employees were given an envelope and the check inside the envelope was short.

### D.     Plaintiff Paula Galindo San Pedro

On direct examination, Plaintiff Pedro stated that she began working for Defendant on June 27, 2008, but that she stopped working on February 14, 2018, because immigration came. She testified that Defendant owes her $2,583 in unpaid wages.

Plaintiff Pedro testified that the working conditions were horrible and that there was no running water in the bathrooms. She stated that sometimes, there was no electricity and that when she needed to use the restroom, she went to a gas station. She testified that trash was a problem all the time. She further stated that there was no air conditioner in the hot season and that during the cold season, it was really cold in the factory. She stated that it was hard to work there.

Plaintiff Pedro testified that Defendant never mentioned ICE to her personally, but she mentioned ICE to a group when she was angry, stating that if the group stopped working for her, she would call immigration. She testified that Defendant also threatened not to pay Plaintiff Pedro's back wages if she quit. Plaintiff Pedro testified that she continued working there due to Defendant's threats and that she suffered mental anguish because of Defendant's actions.

On cross examination, Plaintiff Pedro denied that Defendant only owes her $1,147 in unpaid wages. She testified that she does not recall wearing sweaters in the summer because she was cold. She acknowledged that she wore a sweater in the morning when she first arrived at the factory because it was cold, but she stated that later it became unbearably hot. Plaintiff Pedro testified that the water was turned off because the bills had not been paid. She stated that she went to the gas station if she needed to use the restroom because there was no water in the toilets. Plaintiff Pedro testified that the electricity was also turned off because Defendant did not pay the bill. Plaintiff Pedro testified that Defendant was in the business of making sleeping bags for soldiers and that when the electricity was turned off, Defendant did not tell employees to go home. She stated that Defendant made them wait and that the managers stated that the employees would be paid for waiting, but they were never paid.

### E.     Plaintiff Marta Eusebio Hernandez

Plaintiff Hernandez testified that she was employed by Defendant from January 2, 2008, to January 28, 2018. Plaintiff Hernandez stated that Defendant owes her $2,067 in unpaid wages.

With respect to the working conditions, Plaintiff Hernandez testified that the conditions were unhealthy. She testified that the bathrooms were not clean and that there was no running water or toilet paper. She stated that she used cold water to wash her hands because there was no hot water. She also stated that there was no soap to wash her hands. Plaintiff Hernandez testified that when she arrived in the morning, the smell of trash was unbearable and that cockroaches, mice, and other animals were attracted to the food. She stated that in the hot weather season, she suffered because there was no cool air and that in the cold season, there was no heat. Plaintiff Hernandez stated that she brought a space heater to work but that she was not allowed to use it because it would cause the fuse to blow.

10

Plaintiff Hernandez testified that Defendant frequently made threats about ICE when she was angry or irritated when employees requested pay. She testified that Defendant stated, "People like us here don't have rights in this country." Plaintiff Hernandez stated that Defendant also threatened her that if she quit, she would not receive her back pay. Plaintiff Hernandez testified that she worked longer for Defendant than she otherwise would have because of Defendant's threats. She stated that she suffered mental anguish as a result of Defendant's actions.

On cross examination, Plaintiff Hernandez identified a timecard for December 24, 2017, to January 2, 2018, and stated that the amount worked was not paid. Plaintiff Hernandez testified that she signed a document in exchange for her check, but the amount was not the full amount owed. She stated that she was missing $100 from the last check she received, but she was told to sign before she could accept the check. When asked why she continued to sign without receiving the full amount of her wages, Plaintiff Hernandez testified that Defendant made employees sign, but the check in the envelope was short.

Plaintiff Hernandez testified that the employees brought their own soap and disinfectant and that she also brought her own toilet paper. She testified that bills were due around the thirteenth of the month and that toward the end of the month is when employees were without water for three days. She testified that an employee collected water so that employees could use it in the toilets, but the water was very dirty.

Plaintiff Hernandez denied that Defendant owes her $1,147.32 in unpaid wages. She stated that Defendant had the practice of confusing people with respect to how much was owed and that Defendant would pay the least amount. She testified that she took pictures of her timecards and checks because Defendant used to tell her that she lost the timecards, and therefore, was not sure how much was owed. Plaintiff Hernandez acknowledged that there were two occasions when there was a discrepancy of 42 cents on her check and that Defendant paid her those amounts.

11

Plaintiff Hernandez testified that she was not confused about her paychecks, but other employees were confused because they did not keep records.

### F.     Plaintiff Maria Yanez

Plaintiff Yanez testified that she was employed by Defendant.  She stated that she does not remember the exact date that she began her employment with Defendant, but she started working in 2005.  She testified that she stopped working for Defendant on February 14, 2018, because ICE came to the factory.

With respect to the working conditions, Plaintiff Yanez testified that there was no running water and sometimes there was no electricity.  She stated that there was no soap and that she had to bring soap from home to wash her hands.  Plaintiff Yanez testified that employees also brought toilet paper from home.  She testified that when she asked Defendant why there was no toilet paper, Defendant stated that she purchased toilet paper and if the employees could not economize or save it, then that was their problem.  She testified that when it was hot, the air conditioner did not work. She stated that in the cold weather season, employees brought space heaters to work, but the space heaters would make the machines "go off," so they were no longer allowed to use them.  Plaintiff Yanez testified that the factory was not clean and that there were rats.

Plaintiff Yanez stated that Defendant threatened to call ICE in front of the American workers and that she did not care that the American workers overheard her threats.  Defendant did not personally threaten Plaintiff Yanez that she would not receive back wages if she quit.  She testified that she did continue working at the factory because of Defendant's threats.  She stated that she suffered mental anguish as a result of Defendant's actions.

On cross examination, Plaintiff Yanez denied that the correct claim for back wages is $972.80.  She denied working for Defendant while using a different name.  She stated that she refused to work one time when she had not been paid.  Plaintiff Yanez testified that when she

collected her check, she would often sign a notebook, but occasionally, she signed a piece of paper. She testified that she continued to work for Defendant without pay and in horrible working conditions because she wanted her money for the work already performed.

### G. Plaintiff Maricruz Lopez

Prior to Plaintiff Lopez testifying on direct examination, Defendant stated that she stipulated to the amount owed to Plaintiff Lopez for back wages—that is, $7,713.00. Plaintiff Lopez testified that she suffered mental anguish as a result of Defendant's actions.

On cross examination, Plaintiff Lopez stated that she and Defendant discussed the fact that Defendant owed her money, but they did not discuss the exact amount. When she began working for Defendant, she sewed, but later, she became manager of the line.

With respect to the working conditions, Plaintiff Lopez stated that Defendant purchased toilet paper but that it was infrequent and that Plaintiff Lopez and another manager purchased toilet paper with their own money at the Dollar Tree. Plaintiff Lopez stated that the toilet paper was kept in the office. When Plaintiff Lopez purchased toilet paper, she kept it in the filing cabinet, and employees could get the toilet paper when necessary.

Plaintiff Lopez testified that sometimes she distributed paychecks and calculated the pay for the employees on her line. She testified that employees were upset when they had to wait until 8:00 p.m., to receive their checks because Defendant was late and some employees lived in Knoxville or Morristown. She stated that sometimes the money was not enough. Plaintiff Lopez testified that the tax amount on her own paycheck was 10%.

### H. Christie Hill

Christie Hill ("Hill") testified that she previously worked for Defendant for about a year and that Defendant owed her unpaid wages. She testified that Defendant acknowledged that she owed her money and that Defendant discussed getting a loan to pay Hill's wages.

Hill testified that Defendant mentioned ICE to her on one occasion. Hill explained that Defendant stated that if the Mexicans continued to stir up trouble, she would contact ICE herself. Hill stated that with respect to the working conditions, Plaintiffs' testimony is accurate. Hill identified text messages to and from Defendant as follows:

December 15, 2017

Hill:           Bring me some socks. It's freezing[.]
Defendant:      We are in line for a fuel delivery we just got fuel
                Saturday and Belinda is getting kerosene right now[.]

[Ex. 1]. Hill also identified the following text messages:

December 9, 2017

Hill:           Did you pay yesterday? If so, I wanted to stop by the
                restaurant to get it. Let me know. Thanks.

Defendant:      Yes we did, but I gave Holston gas all of my cash bc
                [sic] we were out of propane[.] I can give it to you
                Monday morning first thing when the bank opens.

Defendant:      No one told me yesterday we were out of fuel som
                [sic] I had to get an emergency delivery this morning.
                I didn't plan for it.

Defendant:      Omg[.] Donna came in [and] absolutely showed her
                ass[.]

Hill:           Oh Lord.[] What did she do?
                And Monday is fine.

Defendant:      Yelling to the top of [h]er lungs wanting her damn
                check[.] I was making her wait the 21 days like
                everyone else[,] and man the white trash floated to
                the top.

Hill:           Glad I didn't get to witness that. I might have been
                tempted to throat punch her. Now I sound like white
                trash!

[Ex. 2].

14

On cross examination, Hill testified that her last day of employment with Defendant was January 24, 2018. Hill stated that Defendant owes her $768 without taxes and that Hill turned her unpaid wage claim to the Tennessee Department of Labor.

Hill testified that Defendant did not became angry when Hill left work because she was cold. Hill stated that the standard practice was to receive pay on Friday, but many times, Hill would not receive her pay until the following Monday. Hill stated that her paycheck was never short, except one time when it was short about $10. She stated that the Hispanic people were not treated differently than the Americans and that she only heard Defendant mention ICE one time. Hill stated that when she first started working for Defendant, getting paid was not an issue.

I.      **Angela Muse Merkel**

Angela Merkel ("Merkel") testified that she worked for Defendant at her store in Jacksboro. She testified that Defendant deducted money from her paycheck that was supposed to go to the IRS. She testified that she received letters from the IRS stating that it did not receive the money. *See* [Ex. 4 and 5]. She testified that she went off payroll in December 2016.

On cross examination, Merkel testified that in 2013, Defendant hired a payroll company for a brief period of time. She testified that she did not pay taxes on her overtime. She testified that she prepared everyone's W2 forms.

J.      **Tammy Walker**

During direct examination, Defendant testified that the only Plaintiff that was correct about the amount owed for unpaid wages is Plaintiff Cruz. She testified that several people are angry for different reasons and that Plaintiffs have filed a motion for a visa based on their alleged treatment and that their testimony is exaggerated in order to become a permanent citizen. Defendant testified that she provided birthday and Christmas parties and that a church group

15

visited the factory for five years. Defendant stated that a Hispanic pastor held a service every Wednesday during lunch.

Defendant acknowledged that she experienced financial problems based on production, but she testified that she never threatened to call ICE. With respect to the conditions of the factory, she stated that she had two employees who were trying to cause trouble. She stated that there was never an issue with toilet paper, paper towels, or trash. She explained that 90% of the people who ate lunch at the factory were the Hispanics and that they would not throw their trash away. She testified that "things" got bad at one point but that she never threatened or mistreated anyone.

On cross examination, she was asked about her convictions relating to passing worthless checks. [Ex. 6-8]. Defendant testified that all of the checks subject to those convictions have now been paid in full.

## III. ANALYSIS

The Court has considered Plaintiffs' Motion, the oral arguments, and the evidence presented at the January 22 and January 23 hearings. Accordingly, for the reasons further explained below, the Court **RECOMMENDS** that Plaintiffs' Motion [**Doc. 9**] be **GRANTED IN PART AND DENIED IN PART.**

The Court will first discuss the standard with respect to default judgments pursuant to Federal Rule of Civil Procedure 55 and then turn to Plaintiffs' requested amount for damages.

### A. Rule 55

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Following the entry of default, a party may apply for default judgment, and the Court may conduct a hearing – if needed, to perform an accounting, determine the amount of damages, establish the truth of any allegation by evidence, or investigate

16

any other matter – prior to entering default judgment. Fed. R. Civ. P. 55(b). "Once the Clerk has entered a default against a defendant, the Court must treat all well-pleaded allegations in the Complaint as true." *AF Holdings LLC v. Bossard*, 976 F. Supp. 2d 927, 929 (W.D. Mich. 2013) (citing *Thomas v. Miller*, 489 F.3d 293, 299 (6th Cir. 2007) (entry of default judgment "conclusively establishes every factual predicate of a claim for relief")).

In the present matter, the Complaint was filed on May 3, 2018. Defendant was served with process [Doc. 6] but never responded to the Complaint. There is no dispute that the Clerk has entered a default [Doc. 8] against Defendant in accordance with Rule 55. At the December 4 hearing, Defendant acknowledged that she was aware that the Clerk entered a default. Defendant has not moved to set this entry aside, and therefore, she is deemed to have admitted all of Plaintiffs' well-pleaded allegations.

The Court notes, however, that "[e]ven though the well-pleaded factual allegations of the complaint are accepted as true for purposes of liability, the Court must still determine whether those facts are sufficient to state a claim for relief as to the causes of action for which the plaintiffs seeks default judgment." *Chanel, Inc. v. Jermaine Wrice*, No. 5:13-CV-891, 2015 WL 521144, at *3 (N.D. Ohio Feb. 9, 2015).[1] The Court does not find that Plaintiffs have stated a claim of relief under 18 U.S.C. § 1590. This statute relates to trafficking with respect to peonage, slavery, involuntary servitude, or forced labor. The Complaint contains no allegations to support trafficking, and Plaintiffs' claim of trafficking under the TVPA is simply a restatement of their

---

[1] The Court observes that while Plaintiffs' Complaint alleges a number common law violations, their Motion requests a default judgment for Defendant's FLSA and VTPA violations. Thus, the Court finds it unnecessary to address Plaintiffs' claims for breach of contract; quantum meruit/unjust enrichment; common law fraud, fraudulent misrepresentation, and fraudulent inducement; and conversion. *See J&J Sports Productions, Inc., v. Rodriguez*, No. 1:08-cv-1350, 2008 WL 5083159, at *1 (N.D. Ohio Nov. 25, 2008) (analyzing one cause of action under the default judgment standard because plaintiff sought default judgment on only its first cause of action).

17

forced labor claim. *See* [Doc. 1 at ¶¶ 45-48]; *see also Ali v. Khan*, 336 F. Supp. 3d 901, 906 (N.D. Ill. 2018) (finding that the complaint did not state a cause of action under 18 U.S.C. § 1590 because there were no allegations that defendant "recruited or otherwise obtained [plaintiff's] person for labor or services, as the text of section 1590 requires"). Accordingly, the Court will not recommend that Defendant be adjudged as having violated 18 U.S.C. § 1590.

With respect to violations of the FLSA and the VTPA, 18 U.S.C. § 1589, taking as true the allegations in the Complaint [Doc. 1], the Court **INCORPORATES BY REFERENCE** the allegations as set forth by Plaintiffs. The Court accepts all such allegations, and specifically, the Court **FINDS**, based upon entry of default, that Defendant has committed violations of the FLSA by failing to pay Plaintiffs all wages due, including compensation for overtime. In addition, the Court **FINDS** Defendant has violated the VTPA, 18 U.S.C. § 1589, by threatening to report Plaintiffs to ICE if they quit their employment with Defendant or when they requested their unpaid wages.

The Court will now turn to Plaintiffs' requested damages.

## B. Damages

In their Motion, Plaintiffs have requested damages pursuant to the FLSA and the VTPA. The Court will first address damages under the FLSA and then turn to damages under the VTPA.

### 1. Damages under FLSA

Pursuant to the FLSA, an employer must pay his/her employees minimum wage. 29 U.S.C. § 206. Further, an employer generally must compensate an employee "at a rate not less than one and one-half times the regular rate at which he is employed" for work exceeding forty hours per week. 29 U.S.C. § 207(a)(1). As explained by the Sixth Circuit, "Congress passed the FLSA with broad remedial intent." *Keller v. Miri Microsystems, LLC*, 781 F.3d 799, 806 (6th Cir. 2015) (citing *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 509-11, 515 (1950)). Plaintiffs who bring

18

claims under the FLSA for unpaid overtime compensation must establish that they performed work for which they were not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688-88 (1946), *superseded by statute on other grounds*, Portal-Portal Act of 1947.

Further, § 216(b) of the FLSA provides that "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Such damages are "compensation, not a penalty or punishment." *Elwell v. University Hospitals Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002) (quoting *McClanahan v. Matthews*, 440 F.2d 320, 322 (6th Cir. 1971)) (other quotations omitted). The court, however, has the discretion not to award liquidated damages to a prevailing plaintiff if "the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." *Elwell*, 276 F.3d at 840 (quoting 29 U.S.C. § 260). A prevailing plaintiff is also entitled to an award of attorney's fees. 29 U.S.C. § 216(b).

With the above guidance in mind, the Court will now turn to Plaintiffs' requested damages under the FLSA. Here, each Plaintiff testified to the amount he/she is owed in unpaid wages. As further explained below, the Court finds that Defendant did not rebut Plaintiffs' testimony regarding their unpaid wages. While Defendant generally disputed the amounts, she offered no corroborating evidence to support her testimony. The Court finds Plaintiffs are entitled to their unpaid wages as further explained below.

With respect to liquidated damages under the FLSA, the Court finds that Plaintiffs have established that they are entitled to liquidated damages. Here, Defendant does not dispute that she owes Plaintiffs for unpaid wages. Instead, she disputes the amounts owed. The Court finds that

19

Plaintiffs have established that Defendant knowingly committed violations of the FLSA. Defendant did not establish her actions were in good faith or that she had a reasonable belief that her actions were not in violation of the FLSA. Accordingly, the Court finds Plaintiffs are entitled to liquidated damages as further explained below.

The Court will now address each Plaintiff's damages under the FLSA separately.

### i.    Plaintiff Alfonso

Plaintiff Alfonso testified that he began his employment on September 24, 2007, and ended his employment on December 7, 2017. Plaintiff Alfonso stated that Defendant owes him $1,626.88 for unpaid wages. Although Defendant did not sufficiently rebut this figure, the Court observes that this figure is mathematically incorrect. Specifically, in his Affidavit, Plaintiff Alfonso states that Defendant owes him $1,626.88 for unpaid wages and provides his hourly rate, dates worked, and hours worked as follows:

> In several of the weeks prior to me quitting my position on December 7, 2017, Walker failed to [pay] me for work[] performed, and she owed unpaid wages to me in the amount of at least one-thousand six hundred and twenty-six dollars and eighty-eight cents ($1,626.88). This figure is a sum certain based on my calculation of wages owed to me based on my hourly wage rate of $9.50 per hour, which includes the amount of overtime pay that should have been paid to me pursuant to the [FLSA].

> In particular, on the week beginning on September 2, 2017, I worked 57.5 hours for which I was not paid; on the week beginning on November 13, 2017, I worked 56.5 hours for which I was not paid; and the week beginning on December 4, 2017, I worked 32 hours for which I was not paid.

[Doc. 9-2 at ¶ 6]. Based on the above rate and hours, Plaintiff Alfonso's total amount for unpaid wages is $1,548.51. Accordingly, the Court **RECOMMENDS** that Plaintiff Alfonso be awarded $1,548.51 for unpaid wages.

20

Further, the Court finds an award of liquidated damages to be appropriate. Plaintiff Alfonso testified that he left Defendant's employment because she would not pay him, and she told him to return in twenty-one (21) days to obtain his check. When he returned, Defendant did not pay him and threatened to call ICE. Accordingly, the Court **RECOMMENDS** that Plaintiff Alfonso be awarded $1,548.51 for liquidated damages.

### ii. Plaintiff Jacuinde

Plaintiff Jacuinde testified that she began working for Defendant on April 24, 2017, and that she ended her employment on February 10, 2018. [Doc. 9-3 at ¶ 6]. She testified that Defendant owes her $2,981.25 for unpaid wages. In her Affidavit, she explains that this figure is based on her hourly wage rate of $9.00 per hour. [*Id.*]. Specifically, she worked 57.5 hours each week for five weeks and was not paid. Defendant did not sufficiently rebut Plaintiff Jacuinde's testimony. Accordingly, based on Plaintiff Jacuinde's testimony, the Court **RECOMMENDS** Plaintiff Jacuinde be awarded $2,981.25 for unpaid wages.

Further, the Court finds an award of liquidated damages to be appropriate. The Court finds Defendant's actions were willful based on Plaintiff Jacuinde's testimony that Defendant made threats to Plaintiff Jacuinde that if she did not continue to work without pay, she would not receive any back wages that were owed. Further, Plaintiff Jacuinde testified that on one occasion, Defendant gave her a check for her wages, but the check could not be cashed due to insufficient funds. Accordingly, the Court **RECOMMENDS** that Plaintiff Jacuinde be awarded $2,981.25 for liquidated damages.

### iii. Plaintiff Cinto

Plaintiff Cinto testified that she ended her employment with Defendant on January 27, 2018. She testified that Defendant owes her $1,755 for unpaid wages. Although Defendant did not sufficiently rebut this figure, the Court observes that this figure is mathematically incorrect.

21

Specifically, in her Affidavit, Plaintiff Cinto states that Defendant owes her $1,755 for unpaid wages and provides the hourly rate, dates worked, and hours worked as follows:

> This figure is a sum certain based on my calculation of wages owed to be based on my hourly wage rate of $9.00 per hour, which includes the amount of overtime pay . . . .
>
> In particular, I worked 51.5 hours on the week beginning on January 8, 2018; I worked 39 hours on the week beginning January 15, 2018; and I worked 53 hours on the week beginning January 22, 2018. The aforementioned total amount also includes the check dated November 17, 2017, in the amount of three hundred and sixty dollars ($360.00) from Tammy Walker that was returned as having insufficient funds.

[Doc. 9-1 at ¶ 6]. Based on the above rate and hours, Plaintiff Cinto's total amount for unpaid wages is $1,761.75. Accordingly, the Court **RECOMMENDS** that Plaintiff Cinto be awarded $1,761.75 for unpaid wages.

The Court further finds an award of liquidated damages to be appropriate. Plaintiff Cinto testified that her checks were not in the full amount owed and that she told Defendant that Defendant owed her for unpaid wages. Defendant did not pay her. Accordingly, the Court **RECOMMENDS** that Plaintiff Cinto be awarded $1,761.75 for liquidated wages.

### iv. Plaintiff Pedro

Plaintiff Pedro testified that she ended her employment with Defendant on February 14, 2018. She testified that Defendant owes her $2,583 for unpaid wages. Although Defendant did not sufficiently rebut this figure, the Court observes that this figure is mathematically incorrect. Specifically, in her Affidavit, Plaintiff Pedro states that Defendant owes her $2,583 in unpaid wages and provides the amount for each week as follows:

> This figure is a sum certain based on my calculation of wages owed to me based on my hourly wage rate of $10.00 per hour, which includes the amount of overtime pay that should have been paid to me pursuant to the Fair Labor Standards.

22

> In particular, I am owed $490.00 in unpaid wages for the week beginning November 27, 2017; I am owed to $242.00 in unpaid wages for the week beginning December 18, 2018; I am owed $599.00 for the week beginning January 8, 2018; I am owed $550.00 for the week beginning January 22, 2018; and I am owed $517.00 for the week beginning January 29, 2018.[2]

[Doc. 9-7 at ¶ 6]. Based on the above amounts, Plaintiff Pedro's total amount for unpaid wages is $2,398.00. Accordingly, the Court **RECOMMENDS** that Plaintiff Pedro be awarded $2,398.00 for unpaid wages.

The Court further finds an award of liquidated damages to be appropriate. Plaintiff Pedro testified that on one occasion, she asked for her check because her family was sick and she needed the money. She stated that Defendant told her that she did not have any money to pay her. Plaintiff Pedro has testified that Defendant threatened that if she (Plaintiff Pedro) quit, Defendant would not pay any back wages that were owed. Accordingly, the Court **RECOMMENDS** that Plaintiff Pedro be awarded $2,398.00 for liquidated damages.

### v.    **Plaintiff Hernandez**

Plaintiff Hernandez testified that she began working for Defendant on January 2, 2008, and she ended her employment on January 26, 2018. [Doc. 9-6 at ¶ 3]. She testified that Defendant owes her $2,067 for unpaid wages. In her Affidavit, she explains that this sum is based on her hourly rate of $8.50 per hour. [*Id.* at ¶ 6]. She explains as follows:

> I am owed $458.00 in unpaid wages for the weeks beginning October 30, 2017, and November 13, 2017; I am owed $162.00 in unpaid wages for the week beginning December 18, 2017; I am owed $518.00 in unpaid wages for the week beginning January 8, 2018; I am owed $490.00 in unpaid wages for the week beginning January 15, 2018; and I am owed $439.00 in unpaid wages for the week beginning January 22, 2018.

---

[2] The Court believes that the "December 2018" date is a typographical error.

23

[*Id.*].  The Court finds that Defendant has not sufficiently rebutted Plaintiff Hernandez's testimony as to the amount of money she is owed.  Accordingly, the Court **RECOMMENDS** that Plaintiff Hernandez be awarded $2,067 for unpaid wages.

Further, the Court finds an award of liquidated damages to be appropriate.  Specifically, Plaintiff Hernandez testified that she made requests for payment, and Defendant became angry and refused to pay her.  She also threatened to call ICE on Plaintiff Hernandez when she made a request for payment.  Further, Plaintiff Hernandez testified that Defendant made threats that if Plaintiff Hernandez quit, Defendant would not pay her any back wages.  Accordingly, the Court **RECOMMENDS** that Plaintiff Hernandez be awarded $2,067 for liquidated damages.

### vi.    Plaintiff Yanez

Plaintiff Yanez testified that she began her employment with Defendant in 2005 and ended her employment on February 14, 2018.  She testified that Defendant owes her $2,257.50 for unpaid wages.  Specifically, in her Affidavit, she states:

> In particular, I am owed $677.50 in unpaid wages for the week beginning January 22, 2018; I am owed $677.50 in unpaid wages for the week beginning January 29, 2018; and I am owed $315.00 for the week beginning February 12, 2018.

[*Id.* at ¶ 6].  Defendant did not sufficiently rebut the above testimony.  Accordingly, the Court **RECOMMENDS** Plaintiff Yanez be awarded $2,257.50 for unpaid wages.

Further, the Court finds an award of liquidated damages to be appropriate.  Specifically, Plaintiff Yanez testified that she continued to work there without pay because Defendant made threats regarding ICE.  Accordingly, the Court **RECOMMENDS** Plaintiff Yanez be awarded $2,257.50 for liquidated damages.

### vii.    Plaintiff Lopez

At the hearing, Defendant stipulated that she owed Plaintiff Lopez $7,713.00 for unpaid wages.  Accordingly, the Court **RECOMMENDS** Plaintiff Lopez be awarded $7,713.00 for unpaid wages.

The Court further finds an award of liquidated damages to be appropriate.  Defendant acknowledged that she owed Plaintiff Lopez unpaid wages.  Defendant did not establish that her actions were in good faith or that she believed she was not in violation of the FLSA.  Accordingly, the Court **RECOMMENDS** that Plaintiff Lopez be awarded $7,713.00 for liquidated damages.

### 2.    Damages under the TVPA

The TVPA provides a private cause of action for victims of forced labor.  *Ali*, 336 F. Supp. 3d at 906 (citing Pub. L. No. 108-193 § 4(a)(4)(A)).  With respect to a civil cause of action, 18 U.S.C. § 1595 provides as follows:

> (a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving any of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

As compensatory damages, courts have awarded "noncomnic damages, such as emotional distress and pain and suffering, resulting from the forced labor and similar working conditions." *Cruz-Cruz v. Conley-Morgan Law Grp., PLLC*, No. 5:15-CV-157-REW, 2017 WL 2112637, at *4 (E.D. Ky. May 15, 2017); *see also Rana v. Islam*, 210 F. Supp. 3d 508, 516 (S.D. N.Y. 2016), *vacated in part on other grounds*, 887 F.2d 118 (2d Cir. 2018); *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 24 (D.D.C. 2013) ("The TVPA recognizes emotional distress damages as a "form of compensatory damages.").  "To determine emotional distress damages, courts are to examine the duration and intensity of the emotional distress" and "also look to other awards in similar cases to

25

ensure that the award is within a reasonable range." *Id.* (internal quotation marks and citations omitted).

In the present matter, each Plaintiff has requested $10,000 for mental anguish. The Court has considered Plaintiffs' request but finds that amount excessive given the little detail provided during their testimony or included in their affidavits. Specifically, Plaintiffs testified, except Plaintiff Jacuinde, that Defendant threatened to call ICE on them when they requested their wages or when Defendant believed Plaintiffs were going to quit. No Plaintiff, however, testified as to the duration and intensity of their emotional distress or how often Defendant's threats occurred.[3] Instead, all Plaintiffs, except Plaintiff Jacuinde, testified generally that they sustained mental anguish as a result of Defendant's conduct. Plaintiffs further testified to the poor conditions of the factory, such as no air conditioning and no heat. In addition, they testified that, at times, there was no running water or electricity. They also testified that cockroaches and rates were present in the factory. No Plaintiff, however, testified to how long they had to endure these poor working conditions.

While the Court finds that Plaintiffs' testimony relating to Defendant's threats, coupled with the poor working conditions, deserves some award, the Court finds $10,000 each to be excessive given the lack of detail and because it is not clear how long Plaintiffs had to endure such mistreatment. The Court has considered the testimony and finds that the testimony supports an award of $2,000 to each Plaintiff, except Plaintiff Jacuinde. Accordingly, the Court **RECOMMENDS** that each Plaintiff, except Plaintiff Jacuinde, be awarded $2,000 for emotional distress pursuant to 18 U.S.C. § 1595.

---

[3] The Court observes that in considering the testimony as a whole, it appears that Defendant began having financial troubles in the latter part of 2017 through February 14, 2018. This time period is when Plaintiffs have testified that they were not paid wages. Defendant threatened to call ICE when Plaintiffs requested payment or when she believed that they were going to quit due to lack of payment.

26

With respect to Plaintiff Jacuinde, the Court will not recommend an award for emotional distress under the TVPA. As mentioned above, Plaintiff Jacuinde also requested $10,000 for her pain, suffering, and mental anguish. [Doc. 9-3 at ¶ 10] ("I have also suffered substantial pain, suffering, mental anguish, physical abuse and mental abuse as a result of the actions of the Defendant."). At the hearing, however, she testified that did not experience mental anguish as a result of Defendant's actions. Her testimony is wholly inconsistent with her statement in her affidavit. Accordingly, the Court will not recommend that Plaintiff Jacuinde be awarded emotional distress damages pursuant to 18 U.S.C. § 1595.

### C.    Attorney's Fees and Costs

Both the FLSA and the TVPA provide that prevailing plaintiffs are entitled to an award of reasonable attorney's fees. *See* 18 U.S.C. § 1595 and 29 U.S.C. § 216. In support of their requests for attorney's fees, Plaintiffs filed a Supplemental Affidavit on Attorney's Fees and Discretionary Costs [Doc. 28] ("Supplemental Affidavit"). Specifically, Plaintiffs request $9,140.00 in attorney's fees and $2,224.71 for "court courts and discretionary costs."

With respect to the attorney's fee, the Court has reviewed the times entries and the hourly rate. The Court finds that the time spent in this matter and the hourly rate to be reasonable. In determining whether fees are reasonable, courts apply the lodestar method, which is "the proven number of hours reasonably expended on the case by the attorney, multiplied by a reasonable hourly rate." *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005). With respect to Attorney Houston's billable rate of $200, the Court finds this fee to be reasonable. Further, the Court finds the time spent in this case, as provided in the billing entries, to be reasonable given the number of filings in this case and the three hearings, two of which were evidentiary hearings. The Court has considered the factors that may support increasing or decreasing the initial lodestar calculation, but the Court finds no grounds for making a modification. As a final matter, the Court

27

notes that Attorney Houston billed for drafting the Motion for U-Visa Certification and preparing the proposed Form 1-918 forms. Because the relief sought in that Motion relates to Plaintiffs' treatment, the Court **RECOMMENDS** that the attorney's fees incurred for drafting the Motion and related filings be allowed if the Motion is granted. *See Villegas v. Metro. Gov't of Davidson Cty./Nashville-Davidson Cty. Sheriff's Office*, No. 3:09-0219, 2012 WL 4329235, at *13 (M.D. Tenn. Sept. 20, 2012) (granting in part the motion for U-visa and excluding one third of the attorney's time sought for the work on the motion for U-visa). Accordingly, the Court **RECOMMENDS** that Plaintiffs be awarded their attorney's fees as detailed in the Supplemental Affidavit.

Further, Plaintiffs have requested their "court costs and "discretionary costs." Federal Rule of Civil Procedure 54(d) directs that costs, other than attorney's fees, should be allowed to the prevailing party. Fed. R. Civ. P. 54(d)(1). Costs recoverable under Rule 54(d) are specified in 28 U.S.C. § 1920. Specifically, pursuant to 28 U.S.C. § 1920, the Court may tax as costs the following:

> (1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in this case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessary obtained for use in this case; (5) Docket fees under section 1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expense and costs of special interpretation services under section 1828 of this title.

In the Eastern District of Tennessee, the Clerk of Court is charged with assessing these costs after a Bill of Costs has been properly filed. *See* E.D. Tenn. L.R. 54.1. A Bill of Costs has not been filed. *See* E.D. L.R. 54.1 ("If counsel cannot agree, a bill of costs shall be filed by the prevailing party within 21 days from entry of judgment"). Accordingly, the Court

28

**RECOMMENDS** that Plaintiffs be directed to file a Bill of Costs in accordance with this District's Guidelines for Preparing Bill of Costs within the timeframe provided in the Local Rule should judgment be entered in their favor.

Finally, the Court notes that Plaintiffs have incurred translator fees. Several of these entries (i.e., December 17, 2018 and January 25, 2019) appear to relate to oral translation in Court, and therefore, should be included in the Bill of Costs. *See Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 562 (2012) (holding that compensation for interpreters as used in § 1920 is limited to the cost of oral translation and does not include the cost of document translation). The Court **RECOMMENDS** that the remaining expenses for the translator be awarded as litigation expenses. *See Vazquez v. Puerto Rico*, No. 3:14-cv-1644, 2015 WL 847291, at *2 (D.P.R. Feb. 26, 2015) (awarding transcription costs as reasonable out-of-pocket expenses, which are normally billed to the client, and therefore, properly included under 42 U.S.C. § 1988).

## IV. CONCLUSION

Based upon these findings and taking all well-pleaded allegations in the Complaint as true, the undersigned **RECOMMENDS**[4] as follows:

1. Plaintiffs' Motion for Default Judgment [**Doc. 9**] be **GRANTED IN PART AND DENIED IN PART**;

2. Defendant be **ADJUDGED** liable for violating the Fair Labor Standards Act and Victims of Trafficking Protection Act, 18 U.S.C. § 1589;

---

[4] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).

29

3. That judgment in the total amount of $53,454.02, plus post-judgment interest be awarded to Plaintiffs as follows:

   a. Plaintiff Alfonso be awarded $1,548.51 for unpaid wages, $1,548.51 for liquidated damages, and $2,000 for mental anguish, for a total amount of $5,097.02;

   b. Plaintiff Jacuinde be awarded $2,981.25 for unpaid wages and $2,981.25 in liquidated damages, for a total amount of $5,962.50;

   c. Plaintiff Cinto be awarded $1,761.75 for unpaid wages, $1,761.75 in liquidated damages, and $2,000 for mental anguish, for a total amount of $5,523.50;

   d. Plaintiff Pedro be awarded $2,398 for unpaid wages, $2,398 in liquidated damages, and $2,000 for mental anguish, for a total amount of $6,796;

   e. Plaintiff Hernandez be awarded $2,067 for unpaid wages, $2,067 in liquidated damages, and $2,000 for mental anguish, for a total amount of $6,134;

   f. Plaintiff Yanez be awarded $2,257.50 for unpaid wages, $2,257.50 in liquidated damages, and $2,000 for mental anguish, for a total amount of $6,515; and

   g. Plaintiff Lopez be awarded $7,713 for unpaid wages, $7,713 in liquidated damages, and $2,000 for mental anguish, for a total amount of $17,426;

4. That Plaintiffs be awarded their attorney's fees and expenses; and

5. That Plaintiffs be directed to file a Bill of Costs should judgment be entered in their favor.

The Clerk of Court is **DIRECTED** to send Defendant a copy of this Report and Recommendation at the address provided in Plaintiffs' Motion for Default Judgment [Doc. 9].


Respectfully submitted,

Bruce Guyton

United States Magistrate Judge